May it please the court, I'm Janet Gustorf for the plaintiff and appellant here, Neiman Fahnestock. And given the brevity of the argument, I wanted to point out for this court, although I strongly believe that the continuing violations doctrine applies in this case, even if this court ignores all the evidence that predates August 7, 2012, and even if this court ignores all the evidence from Iris Quadra, who was Matthew Waggoner's assistant, and even if this court also ignores all the evidence from Sarah Wilkening, who was another female MMS sales rep during the portion of employment of my client, there still is sufficient evidence to justify reversing for a trial. Specifically, for the hostile work environment claim, we've got weekly meetings from August through January when Matthew Waggoner left Paychex, and my client attended most of those meetings, so they were about an hour long, and during these meetings, he just treated her with contempt and embarrassed her in front of her co-workers, these are professional meetings, this has happened consistently and routinely, and then in addition to... I'm sorry, what is there to indicate that that's based on... Is your claim that this was based on protective conduct or based on sex? For the hostile... I'm sorry? Which claim are you now addressing? Oh, I'm sorry, I'm talking about the hostile work environment, that's the harassment claim. Sex? Yes. Okay. I mean, he may just have been the kind of boss that treats employees badly. He didn't treat all the employees badly, it was just the females, and... Okay, so what evidence is of that? I mean, the fact that he said they were an hour long, and she was treated badly. What evidence is of that? What exactly did he do at these meetings? I mean, she did fall short of her targets, right? Yes, she did. But that is separate from the harassment claim, the hostile work environment claim. Well, no, I... We're only talking from August to December of 2012, we're talking during those four months. I'm just talking hypothetically, if we exclude the argument about the continuing violations. But if he leaves in December of 2012, August is the trigger point if you don't have a continuing violation. January, I believe, is when he leaves. But yes, I'm only counting August, September, October, November, December, five months. They were mandatory weekly meetings, so I'm estimating about 20 meetings, assuming she attended about, most of them, 18 hours of this conduct. Judge, you asked what evidence. Her, Niemann-Vonschdach's declaration details how he acted only to females, not to the males. He said that he would, she said that he would roll his eyes. I'm sorry, whose declaration is this? This is Niemann-Vonschdach's. You can see this at the 4 ER 753-768. She said he was receptive to the ideas of men and dismissive of ideas by the females on the team. He spoke down to her. He mocked her. He was derisive in his communications. He insulted her. He made facial expressions of disgust whenever she expressed ideas during these meetings. I'm sorry, ER what again? I'm sorry? What ER? Four, volume four. ER page number? 753-768. And in addition to his conduct during these meetings, which was in contrast, the way he treated her was different than the way he treated males. She said that he let them participate in a meaningful and professional manner. That's at page 753 of the excerpts of record. And outside of these meetings, they had regular interactions. He routinely, that's her word, routinely winked at her when she would try to bring up a serious concern. So it wasn't just a friendly or even antagonistic winking. It was directly in response to her trying to discuss something serious, which is kind of not going to happen kind of a demeanor. And she says this at 754. He constantly told her, that's her words, constantly, that she needed to move on, retire, give it up. She's a 54-year-old woman. He told her that she was not competent and spoke to her in her words like she was a second-class citizen. That's at page 755. What I'm looking for is the evidence that he, this treatment was, you said, limited to the females. Were there other females? There were other females. The testimony of Sarah Wilkening also, but I was just arguing because I know that they argue that that wasn't admissible. We believe it is. But she confirmed these actions as well. No, I'm talking about even looking at her declaration. Where does she say this is different from the way the men were treated? Well, she said that the winking was only when women attempted to address the serious concerns with him,  And I wrote down it's 754, 755, and also 5ER 942 and 945. He also, I think that the main thing was the treatment, the disparate treatment during meetings. Well, the two things that you mentioned were the treatment was rolling his eyes and winking. The other thing that you mentioned is in paragraph 16 on page 755. And that is when he demeaned her and suggested that she should move on, retire, or give it up. That wouldn't necessarily be based on sex, though, would it? Because at that point, they had quite a history. And she had been, she had received a number of letters from him detailing why he was unsatisfied with her performance. So what evidence is there that paragraph 16 would have been based on sex? Well, there's no evidence that he treated any of the males like that, even when they underperformed. She was not the only person who routinely underperformed. And she testified that he always treated the men with respect. And was she privy to any conversations that he had with any of the men who were underperforming? Outside of meetings, the record's unclear. During meetings, yes. And they all shared the information before meetings and during meetings about each other's sales performance. Now, in paragraph 16, this doesn't say that this went on in the meetings in front of other people. No. These might have been private conversations. Possibly. If so, then how do we get to the evidence of how he treated men who were underperforming in private conversations? I don't think that you can. I don't think that she would be privy necessarily to how he treated the men in other conversations. But his interactions with her were, you have to look at the totality of his interactions with her. And those statements to her have to be read in context with the other behavior that he treated her in these meetings. And the way that he treated her and singled her and the other females out. He also, his letters of concern. I'm sorry, when you say other females, is there any evidence that the allegations in paragraph 16 were directed at other females as well? No, I do not believe so. So what you have in here that suggests different treatment based on sex is contained in paragraph 14. The winking and the glaring. Winking and, is that it? That is, that may be the paragraph. But it is more than just, I mean, what I have is he rolled his eyes while she spoke. He responded sarcastically to her. He spoke down to her as if she's a child. He openly mocked her. He was derisive in his communications. He frequently condescended her. He insulted her often in front of her colleagues. And he made facial expressions of disgust whenever she expressed ideas during meetings. But those could have been based on their sort of longstanding clash over what he saw as a lack of adequate performance, right? I'm really focusing on what evidence she has that he treated her this way because she is a woman or that he treated other women the same way. And the only thing I see in paragraph 14 has to do with the winking. It may be enough. I'm just trying to figure out whether I'm missing anything. I think there's two answers to that. I think one is- Why don't you start with your best answer? Even if that is true, that you could infer that he- That's not an answer. That is saying you don't like my question, you think it's irrelevant. Let's just assume it's important, okay? Even if true, I'm trying to find out whether it is true. The consequence of it being true will take up next. But that's not an answer to my question. Okay. If you were going to say, look, that's all we have and that's fine because there are other arguments, we can go on to that. But right now I'd like to focus on the argument whether that's the only thing there is. Whether I'm missing something. Maybe there are some other things that I'm missing. I believe that she talked in the same- I don't remember if it's the same paragraph, and I'm sorry I don't have the exact paragraph in front of me, but- You can go grab the ER and look at it. I'm looking at it. It's a paragraph. It's in volume four, like you said. It's page 754. It's page five of her declaration. I'm sorry, you were looking at paragraph- Fourteen. Fourteen. That's where she's talking about the winking. That is not where she talks about how he treats her during the meetings. And she does talk at 753- Remember, we're not- I wasn't asking the question about how he treated her. I was asking the question of where is there evidence that he treated her differently because of sex. Or that he treated women differently than men. Yes. Which would be the same thing. I understand. Page 753, paragraph 10. She talks about weekly face-to-face meetings. Those meetings are not individual meetings. These are her weekly staff meetings with him. And she talks about how he would interact with her male colleagues in a collegial manner and mostly avoid making eye contact with her. He would also discuss- and that's where I was talking about how he talks down to her. And I'm running short on time there, but this conduct did begin predating August. This happened long before her performance issues. It happened pretty much immediately after she was transferred into his district. And although even if that evidence is not directly actionable, it certainly is still reliable to show a continuous pattern of intent and the way he treated her. So it did not just begin- his treatment of her did not begin in August. It escalated as she continuously complained. But that's a separate issue, a separate cause of action. Suppose she just hated her guts, whether she was male or female, and treated her this way. What is your evidence that it was gender-based and not merely, I don't like your face? There is no evidence that he treated anybody else like this. But he did treat other women like this. It is a reasonable inference. Also, the fact that the other- Sarah Wilk-Lenning's declaration and also Neiman Fonstock's declaration talks about how he did not- If it were this pervasive, where's the evidence? Well, he did not treat the women in this way. He winked only at the women. I'm sorry. He did not treat the males like this. And he would give males handouts. He would basically give them territory that were closer to their houses. He would help them- What is the evidence that it was gender-based and not merely feelings on her part as a human being? There's no- there's nothing specifically that indicates that there was anything that she did to warrant that. There was no interaction that seems to have started any of this. It started the moment she transferred into his district. And he also- But she had received a number of letters indicating that he didn't think that she had met her goals. Do you have evidence that the favorable territory was given to males who were underperforming? Yes. Well, not specifically. I don't have the specific evidence of which males got which territories. But she did- She was told that her numbers were underperforming. But that was largely due to the fact that he would tell Iris Quadra to move unassigned leads and credits and give these handouts to the males who were underperforming and take them away from the women. It wasn't just my client. It was also the other females on the team. And he repeatedly, for years, deprived my client of the same opportunity as her male colleagues. And it wasn't just my client. But that was obviously the bulk of- Counsel, are you here to ask us to go back and fill out the record? Or are you asking us to allow this to go to trial because the record is now complete and there are still conflicts in facts? Oh, no. I am absolutely asking for an opportunity to try this case to the jury. Right. But the evidence is largely in. Is largely what? The evidence is in. Is that correct? You're not faulting the district court for not having allowed you to take additional depositions? That's correct. Okay. I see that I am running out of time. I have a sort of negative question. I want to make sure. You're not, in fact- I am- You're not seeing more discovery. Do you want to go to trial right now? Yes. I mean, if there's an opportunity- I just want to be able to answer the negative questions. I just want to make sure. If there's an opportunity for more discovery, I'm sure we could find more. But on the evidence we have and the reasonable inferences from that evidence, we would love the opportunity to try this case before jury. Thank you. And I- I think your time is up. Okay. Thank you. Thank you. Good morning, Your Honors. I may please the Court. Joshua Henderson on behalf of the appellees. I'd like to address first the appellant's argument about the hostile work environment. And she appears to, at least in the argument today, have conceded the continuing violation piece. I do want to point out and reiterate that the only evidence that's been put forth before this Court that any of the mistreatment that Ms. Fonestock suffered was because of her gender is in the paragraph about the winking. The winking is the only conduct which Ms. Fonestock identifies as being directed at females as opposed to males. So the condescension, the rolling of the eyes, the speaking down to her, that's not gender-based. At least there's no evidence of it. Well, there's also the winking declaration, right? Paragraph 8. Yes, and I believe- may I- Yeah, sure. You must, in fact. I'm sorry, I was actually looking at paragraph 19 on page 5 of the winking declaration, 768 of the excerpts. It was dismissive of any ideas expressed by women, especially Ms. Fonestock. Actually, the full sentence is, while he was receptive to the ideas of men on his team, he was dismissive of any ideas expressed by women, especially Ms. Fonestock. Yes, and I would say that that evidence, such as it is, is not- it's conclusory. It's dismissive. How was he dismissive? What did he say? These were opportunities, these declarations- He was much friendlier at ease and collegial with his male subordinates. Correct. And that does not support a claim for a hostile work environment. The fact that he's friendlier and more collegial with the males, without more, does not support a claim that it's a hostile work environment, that the way that Ms. Fonestock was treated- Well, it comes in two ways. Hostile work environment is one, and discrimination is the other one, right? Well, the evidence could overlap, yes. Well, anyway, this is evidence. It's in page- paragraph 19 of the Wilkening Declaration, and then that other paragraph you were addressing in Ms. Fonestock's declaration. Why isn't that enough? Well, it's not enough, and I'd like to raise why the Wilkening Declaration is subject to the District Court's order sustaining our objections to the conclusory nature of it. Okay. The District Court did not break down all of the statements in the Wilkening Declaration that were inadmissible, but she did- The District Court did say that certain statements by Ms. Wilkening and by Ms. Fonestock where they purport to describe how Mr. Wagner treated the females, the female sales representatives, how those statements were without foundation and were conclusory. And so I think that that reference that you make to paragraph 19 of the Wilkening Declaration falls within the Court's order sustaining our objection. But even so- Well, okay, that's your personal opinion. You now need to make an argument as to why I should- Well, it was not- I mean, you think it is, but why do you think it is? I mean, it's a fairly specific statement. It says- do you have it in front of you? The Wilkening Declaration? Yeah. Yes. He says, he was not as friendly- he was much friendlier at ease and collegial with male subordinates. That's one sentence, page- paragraph 19, lines 15 and 16. And then it says, while he was receptive to the ideas of men on his team, he was dismissive of any ideas expressed by the women, especially Ms. Fonestock. Now, what's conclusory? You are convinced that this is- why don't you convince me? Well, it's conclusory because he was dismissive of any ideas expressed by the women. What does that mean? How was he dismissive of them? I mean, this was the opportunity for the plaintiff to put forth evidence to withstand summary judgment. It's not a placeholder to get her to trial and hope that more evidence comes out. So by describing it as dismissive, that's a label. That's a conclusion. And she does that, both Ms. Wilkening and Ms. Fonestock, throughout their declarations. I'm sorry. So if she's on the stand and telling a jury, look, I was there, and every time a male subordinate raised an issue, he gave it close consideration. Whenever the women raised an issue, he would just dismiss it. You think that would not be enough? To withstand an objection or to get to trial? To get to support a judgment. I think there has to be more, Your Honor. Why? And what about this business about he was much friendlier at ease in collegial with his male subordinates? Well, Your Honor, the ‑‑ I mean, she says that. The jury believes her. Let's say that. Why wouldn't that be enough to support a judgment? Because, you know, both Title VII and the Fair Employment and Housing Act, as you know, do not, you know, do not enshrine a civility code. So the fact that he's ‑‑ and that's directly from Justice Scalia's opinion and on Colley, which says ‑‑ Well, you know, there's no way of going, and that's sort of irrelevant. You can be mean to everybody. You can be nasty to everybody. But you can't be nasty to the women and not to the men. That you can't. There's no civility code, but there is an equality code. And when you ‑‑ you know, this suggests that he is treating the men differently from the women. It doesn't say he has to be nice to everybody. It doesn't say he has to be ‑‑ he can't be mean to everybody. But by saying that because he is friendlier and more collegial to the men, I don't think that you can draw an adverse inference that that means that it's gender based. It could be that they were solid people. Nice guys. Yeah, they got along. And there's no requirement that they ‑‑ that he ‑‑ as long as it's not gender based. Why couldn't the jury just think that's different? I mean, the reason he gets along with them is because they're guys. And he just doesn't feel comfortable having the same easy kind of interaction with people who are not guys. I mean, it's just ‑‑ I mean, you stand there quite confident, but I don't see why a jury couldn't see it differently. And, you know, then there's this thing about winking. Yes. And, you know, he winks at the women. He doesn't wink at the men. Well, I don't know. I mean, why couldn't the jury look at that and say, look, if you put that together with all the other stuff, we think the guy was ‑‑ Was sort of sexist. I think all the other stuff isn't there. I mean, that's the problem. So even if we accept this as gender based, the winking and being dismissive. But, see, there's a lot of stuff in the record that she got treated in ways she didn't like. Now, employees get treated in ways they don't like all the time because, you know, that's what bosses do. And sometimes they have to do it. And sometimes they don't have to do it, but they do it anyway because they're entitled to do it. But when you lay this, you know, when there are these evidence that he treats women differently, that he feels more at ease with men, that he has his facial expressions and winking at the women, then maybe a jury could say, well, all these things that are nasty that she doesn't like, maybe they weren't because of her performance. Maybe they were because of his attitude towards women. Why is it not a jury question? I mean, I think the evidence is not sufficient. You'd enjoy a jury trial, wouldn't you? I'm sorry? You'd enjoy a jury trial, wouldn't you? I do enjoy jury trials, yes, Your Honor. It's a win-win. But I don't think that the evidence is sufficient. You'd be so good. You'd have another scalp. You know, jury victory. Wouldn't that be good? In the right case, absolutely. But I think that the district court was right. There just simply is not enough evidence here. You know, the court, I think, the district court, I think, was willing to assume that it was gender-based. But then it got to the question, the district court below, but then it got to the question of whether it was pervasive. And the court said that, contrary to the statements made by the appellant's counsel, the court, district court, said that we can't, that there's not evidence to establish frequency. I think the district court's absolutely right there. I mean, if we take just the five-month period of time from August 7, 2012, to the end of December, or even early January when Mr. Wagner left Paychex, you know, there's evidence of a weekly meeting, an hour-long weekly meeting. She said she attended most of them. She doesn't identify, you know, how many times and how many meetings the winking occurred. And so, you know, I think, so I think the district court's conclusion that it was not pervasive, I think, is fully supported by the record. I would like to turn my attention to an issue that was not addressed in the argument before me, or by appellant's counsel, but it's the question of Karen Toomey's alleged bias. The appellant makes much in their reply brief about Karen Toomey's alleged bias. Ms. Toomey was the regional manager who made the decision to eliminate the job position that Ms. Fonestock was in, and it was a decision that was based not on Ms. Fonestock's specific performance, but on the sustainability of that position as a whole. Two males fell victim to the same decision, right? Yes. Yeah, so the job elimination resulted in three persons losing their jobs, Ms. Fonestock and two men. Now- You don't think the jury could think they were really all together, they were willing to sacrifice two guys together? You don't think that's- I don't think that's reasonable, Your Honor. Just checking. But I did want to make a point, and that is that the- So in Ms. Fonestock's declaration, she says that Ms. Toomey exhibited hostility towards her during their meeting. The district court sustained our objection to that evidence on the grounds that the declaration contradicted prior sworn testimony, contradicted Ms. Fonestock's deposition testimony, in which she was asked to recall everything she could about the conversation she had with Ms. Toomey, and she said she had a very good conversation with Ms. Toomey and that the conversation went, in her words, extremely well. And the district court, applying this court's decision in Kennedy, said that that was a contradiction, and we will not allow a declarant to create a genuine issue of material fact by contradicting their prior sworn testimony. Now, the appellant has not challenged that evidentiary ruling. They didn't challenge the evidentiary ruling in their opening brief. They didn't mention it in either their opening brief or their reply brief. And so they are barred from making that argument. They've waived it, Your Honor. So I wanted to make that point known. And without that, without the evidence, this so-called evidence that Ms. Toomey had biased towards Ms. Fonestock, we're left with-there's no evidence of retaliatory motive. What we have is a decision by a new regional manager in a turnaround situation, in a region that had not made sales- Are you just repeating stuff in your brief? I'm trying to emphasize the point that there's just not enough evidence. You're repeating stuff in your brief. Well, okay. I mean, I'm simply trying to- Do you have anything new to say? I'm sorry? You know, you responded, the first part of your argument, you responded to opposing counsel's argument, which was fine. If you're going to stand there and sort of repeat your brief, really, we don't have the time for that. No, Your Honor. We really have read your brief. We do understand the case. I understand. I was simply trying to emphasize the point based on there's not enough. That's another way of saying you're going to repeat- Well, no, Your Honor, because I did not have an opportunity to address the fact that the appellant did not challenge that evidentiary ruling. So I want to make that point clear. Okay. Fair enough. And for those reasons, Your Honors, we ask that the court affirm the district court's summary judgment in the appellee's favor. Thank you. Okay. Thank you. I think you have some time left. Not much, but a little bit. Okay. With regard to whether the conduct was pervasive, the standard, the legal standard under the Lyle case that we said in the brief, it's more than occasional, isolated, sporadic, or trivial. It must be a concerted pattern of harassment of a repeated routine or a generalized nature. So this weekly meeting, his routinely winking, that's her words, the constant derision, the telling her to move on, et cetera, this does meet the standard of pervasive. It may not be plentiful, but it is routine. It is a pattern, and it is repeated. With regard to Sarah Welkening's foundation, she was witness. I mean, she was at these weekly meetings. So she witnessed firsthand Wagoner's conduct of Farnstock and the other women. And I wanted to, in addition to agreeing with this court's reference to paragraph 19 of her declaration, I just wanted to also point out paragraph 11 of Neiman Farnstock's declaration on page 753, in addition to the one I had previously pointed out at paragraph 10, where she said, I watched and observed my male colleagues being treated with respect and able to participate in these meetings in a meaningful and professional manner. So this is an instance of her being treated differently than her males, and although a jury might disagree and find an innocent explanation, the point is this just cannot be decided as a matter of law on this record. It needs to be submitted to the jury. Is it fair enough to say I watched being treated differently without any specifics at all? I mean, the only thing you've said is the blinking or the batting of the eyelashes or the winking. I mean, if I was saying, you know, I watched week after week, whereas my male colleagues were treated differently, that's really not a ‑‑ there's no fact there. I respectfully disagree with your account of the amount and the type of his conduct towards her, and I think it's more than just a, oh, he got along well with the males and didn't get along well with females, and he repeatedly ‑‑ I understand that, and I did focus on that with opposing counsel, but you've just added paragraph 11. I'm just not sure what it says that helps. Well, specifically, when she says it seemed like he was trying to encourage me to resign and making it unbearable to attend these meetings, that ties in, in my opinion, to her testimony at 755 ‑‑ I'm sorry, not testimony, her declaration, where she talks about him constantly telling her to move on, retire, give it up, et cetera, paragraph 16 of the declaration. But that's not sex-based. What? That doesn't say anything about sex. But I ‑‑ that is correct. But I think you have to look ‑‑ I thought you were focused on the next sentence. What you're saying is the next sentence, I watched and observed my male colleagues being treated with respect and able to participate in these meetings in a meaningful and professional manner. Yes, that too. It doesn't have any specifics. That is correct. It's not in my declaration, but I think that in the totality of the other things that she said and all the evidence we've submitted in our briefs, that it's enough to at least get to a jury. Thank you. The case as argued will stand submitted.
judges: Kozinski, Bybee, Walter